CLERK'S OFFICE U.S. DIST COURT
AT ROANOKE, VA
FILED

NOV 30 2007

JOHN F. CORCORAN, CLERK
BY: /s/
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

| | | |
|---|---|---|
| KELLY J. TWIGG, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 5:06CV00113 |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| MICHAEL J. ASTRUE, | ) | By: Hon. Glen E. Conrad |
| Commissioner of Social Security, | ) | United States District Judge |
| | ) | |
| Defendant. | ) | |

Plaintiff has filed this action challenging the final decision of the Commissioner of Social Security denying plaintiff's claim for a period of disability and disability insurance benefits under the Social Security Act, as amended, 42 U.S.C. §§ 416(i) and 423. Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g). This court's review is limited to a determination as to whether there is substantial evidence to support the Commissioner's conclusion that plaintiff failed to meet the requirements for entitlement to benefits under the Act. If such substantial evidence exists, the final decision of the Commissioner must be affirmed. Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966). Stated briefly, substantial evidence has been defined as such relevant evidence, considering the record as a whole, as might be found adequate to support a conclusion by a reasonable mind. Richardson v. Perales, 402 U.S. 389, 401 (1971).

The plaintiff, Kelly J. Twigg, was born on June 22, 1959. Mrs. Twigg subsequently earned a general equivalency degree, in addition to a certificate in accounting. She has worked as a receptionist/accounts payable manager and as a machine operator. Mrs. Twigg last worked on a regular basis in 2002. On October 6, 2003, she protectively filed an application for a period of disability and disability insurance benefits. Mrs. Twigg alleged that she became disabled for

all forms of substantial gainful employment on March 26, 2002, due to chronic neck and shoulder pain and numbness on her left side. Mrs. Twigg now maintains that she has remained disabled to the present time. The record reveals that Mrs. Twigg met the insured status requirements of the Act at all relevant times covered by the final decision of the Commissioner. See, gen., 42 U.S.C. §§ 414 and 423.

Mrs. Twigg's claim was denied upon initial consideration and reconsideration. She then requested and received a de novo hearing and review before an Administrative Law Judge. In an opinion dated October 25, 2005, the Law Judge also ruled that Mrs. Twigg is not disabled. The Law Judge found that Mrs. Twigg suffers from discogenic and degenerative disorders of the back. The Law Judge determined that plaintiff's impairments are severe within the meaning of the administrative regulations, but that they do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulations No. 4. See 20 C.F.R. § 404.1520(c)-(d). The Law Judge ruled that plaintiff's impairments render her disabled for performance of all past relevant work roles. The Law Judge concluded, however, that Mrs. Twigg retains the residual functional capacity to perform light and sedentary level work with a sit/stand option, which is unskilled and requires limited general public contact. Given such a residual functional capacity, and after consideration of plaintiff's age, education, and past work experience, as well as the testimony of a vocational expert, the Law Judge determined that Mrs. Twigg can perform other jobs that exist in significant number in the national economy, including but not limited to the unskilled, light jobs of general clerical worker, laundry worker, and table worker, and the unskilled, sedentary jobs of quality control worker, finish machine operator, and security worker. Accordingly, the Law Judge ultimately concluded that Mrs. Twigg is not disabled, and that she is

2

not entitled to a period of disability or disability insurance benefits. See 20 C.F.R. § 404.1520(f).

Mrs. Twigg sought review of the Administrative Law Judge's opinion by the Social Security Administration's Appeals Council. In connection with her appeal, plaintiff presented additional medical records. However, the Appeals Council ultimately adopted the Law Judge's opinion as the final decision of the Commissioner. Having exhausted all available remedies, plaintiff has now appealed to this court.

While Mrs. Twigg may be disabled for certain forms of employment, the crucial factual determination is whether she is disabled for all forms of substantial gainful employment. See 42 U.S.C. § 423 (d)(2). There are four elements of proof which must be considered in making such an analysis. These elements are summarized as follows: (1) objective medical facts and clinical findings; (2) the opinions and conclusions of treating physicians; (3) subjective evidence of physical manifestations of impairments, as described through a claimant's testimony; and (4) the claimant's education, vocational history, residual skills and age. Vitek v. Finch, 438 F.2d 1157, 1159-1160 (4th Cir. 1971); Underwood v. Ribicoff, 298 F.2d 850, 851 (4th Cir. 1962).

After a review of the record in this case, the court is constrained to conclude that the Commissioner's final decision is supported by substantial evidence. The Law Judge's opinion reflects a thorough evaluation of her medical problems and the extent to which they affect her ability to work. Although Mrs. Twigg suffers from severe back problems, substantial evidence supports the Law Judge's determination that her impairments do not preclude all substantial gainful activity. Additionally, the new evidence presented as part of plaintiff's request for review by the Appeals Council creates no new conflict in the record. Therefore, the court finds

3

that there is substantial evidence to support the Commissioner's conclusion that Mrs. Twigg is not totally disabled.

The medical record reveals that Mrs. Twigg was involved in a motor vehicle accident on October 12, 2001. (Tr. 185). She first sought medical treatment on November 5, 2001, when she presented to the emergency room complaining of neck and shoulder pain. (Tr. 166, 169-171). X-rays of the cervical spine showed a loss of cervical lordosis, probably due to muscle spasm, with otherwise normal spinal alignment and no evidence of bony injury. (Tr. 171). The clinical impression was neck strain. (Tr. 170). Plaintiff was prescribed medications and discharged. (Tr. 166, 170).

On November 13, 2001, Mrs. Twigg was examined by Peter Duncanson, a physician assistant, who diagnosed her with a cervical sprain. Mr. Duncanson advised plaintiff to continue taking the medications prescribed by the emergency room physician. (Tr. 210).

During a follow-up appointment with Mr. Duncanson on February 5, 2002, Mrs. Twigg continued to complain of neck pain, as well as numbness in her left upper extremity. Mr. Duncanson discussed plaintiff's case with John M. Zoller, III, M.D., an orthopaedic surgeon, and referred her for an MRI. (Tr. 209). An MRI of the cervical spine on February 13, 2002 showed a mild to moderate central and left paracentral disc protrusion at C5-6 that indented and mildly displaced the spinal cord and caused some narrowing of the left foramen. (Tr. 208).

On March 6, 2002, Dr. Zoller examined Mrs. Twigg and reviewed various treatment options with her. Plaintiff ultimately chose to undergo surgery. (Tr. 207).

Mrs. Twigg last worked on March 22, 2002. (Tr. 73). She claims that she became disabled as of March 26, 2002 (Tr. 40-41, 67, 73-74). On March 26, 2002, Dr. Zoller performed

an anterior decompressive diskectomy and anterior cervical fusion at C5-6. (Tr. 213). Mrs. Twigg tolerated the procedure well and was discharged the following day. (Tr. 215).

During a follow-up examination by Dr. Zoller on May 1, 2002, Mrs. Twigg complained of soreness in her neck and numbness in her left hand and leg. Dr. Zoller noted that Mrs. Twigg should return in four to six weeks, and that he was going to keep her off work until he was able to see her again. (Tr. 206). Mrs. Twigg returned to Dr. Zoller on June 5, 2002. During the examination, Mrs. Twigg complained of ongoing pain, which Dr. Zoller found "concerning." (Tr. 204). Likewise, on July 5, 2002, Dr. Zoller noted that Mrs. Twigg was "miserable," and he opined that her symptoms may be the result of a nonunion of the fusion. Consequently, Dr. Zoller ordered electrodiagnostic testing. (Tr. 201). Subsequent electromyographic and nerve conduction studies were normal. There was no evidence of carpal tunnel syndrome, left ulnar nerve damage, or cervical nerve root compression. (Tr. 202).

On August 7, 2002, Mrs. Twigg complained of increased neck pain to Dr. Zoller. Dr. Zoller noted that she had probably developed a nonunion of the cervical fusion, and that he would order an MRI. (Tr. 201). Although the subsequent MRI of plaintiff's cervical spine revealed no abnormalities (Tr. 199), Dr. Zoller concluded that she had a nonunion of the cervical fusion. Mrs. Twigg agreed to undergo additional surgery. (Tr. 198).

On September 3, 2002, Dr. Zoller performed a posterior cervical fusion of C5-6. (Tr. 221, 226-227). Mrs. Twigg did not experience any complications and was discharged the following day in good condition. (Tr. 221).

Mrs. Twigg returned to Dr. Zoller on October 9, 2002. During the follow-up examination, plaintiff reported that she was feeling better. Dr. Zoller refilled her prescription for

Percoset, and noted that he did not want plaintiff to return to work until she had "a little [more] time to heal." Plaintiff was advised to return in four to six weeks. (Tr. 197).

On November 25, 2002, Dr. Zoller noted that Mrs. Twigg was not any better, and that she was experiencing interscapular pain, left-sided neck pain, and left shoulder pain. Dr. Zoller prescribed Celebrex and advised plaintiff that he would see her again in six to eight weeks. (Tr. 196).

On January 13, 2003, Mrs. Twigg continued to complain of left-sided neck pain, as well as numbness in three of the fingers on her left hand. Based on her physical examination, Dr. Zoller noted that her cervical bones had likely fused. (Tr. 196). Nonetheless, he arranged for another MRI and suggested that she receive a second opinion. (Tr. 195).

Mrs. Twigg underwent a cervical MRI on January 22, 2003. The diagnostic impression was "[s]tatus post fusion of C5 and C6 both anteriorly and posteriorly with laminectomies at these levels." (Tr. 194). There was no evidence of spinal stenosis, disc herniation, or foraminal narrowing. (Tr. 194).

On March 7, 2003, Mrs. Twigg was evaluated by Gabriella Szatmary, M.D., a neurologist. During the evaluation, Mrs. Twigg complained of pain in the back of her neck and between her shoulders, as well as numbness and weakness in her arms. (Tr. 191). Dr. Szatmary noted that Mrs. Twigg's neurological examination was significant for hyperreflexia[1] without clonus and local tenderness over the C5-6 area. Otherwise, the examination revealed no abnormalities. Dr. Szatmary opined that most of Mrs. Twigg's symptoms were musculoskeletal in nature, discontinued her Percoset, and started her on Lortab. (Tr. 192).

---

[1] Hyperreflexia is defined as an "exaggeration of reflexes." Dorland's Illustrated Medical Dictionary 798 (27th Ed. 1988).

Mrs. Twigg saw Dr. Szatmary again on May 8, 2003. Although plaintiff continued to complain of cervical pain and occasional radicular symptoms, her neurological examination was essentially normal. Dr. Szatmary referred plaintiff for an epidural steroid injection and recommended that she return for a follow-up examination in twelve weeks. (Tr. 190).

On May 29, 2003, David G. Anderson, M.D., performed a consultative orthopaedic examination, during which Mrs. Twigg complained of pain in her neck and shoulders that radiated down her left arm, in addition to numbness in her left hand and leg. (Tr. 185-186). On physical examination, plaintiff had a normal gait; a well-healed scar on her neck; some widening of the posterior cervical muscles; some tenderness to palpation over the back of her neck; normal muscle strength with the exception of slightly reduced strength in the right finger flexors; normal reflexes; some pain and numbness in the C6 dermatomal distribution; no pain with range of motion of her hips, knees, or ankles; and no distal pitting edema. Dr. Anderson recommended a cervical myelogram and a CT scan, and encouraged Mrs. Twigg to quit smoking. (Tr. 186).

A follow-up physical examination by Dr. Anderson on June 27, 2003 was unremarkable. (Tr. 174). Mrs. Twigg had full strength in her upper and lower extremities; normal sensation; symmetric reflexes; and a normal gait. Dr. Anderson noted that her cervical myelogram and CT scan showed "excellent position of the hardware and fusion and no evidence of spinal cord or severe neuroforaminal compression." (Tr. 174). Dr. Anderson stated that he was concerned about the leg symptoms that Mrs. Twigg described, and that they may be originating in the lumbar region. Thus, he recommended a lumbar MRI. (Tr. 174).

Mrs. Twigg returned to Dr. Anderson on July 25, 2003. Dr. Anderson noted that the MRI of plaintiff's lumbar region showed "some mild disc degeneration at multiple levels" and "some very mild, early lateral recess stenosis at the L3-4 and L4-5 levels." (Tr. 153). Dr. Anderson

opined that her symptoms related to her lower back may be the result of "very mild lateral recess stenosis," for which he recommended a lumbar epidural steroid injection. (Tr. 153).

On August 8, 2003, Mrs. Twigg returned to Dr. Zoller. She complained of ongoing neck pain, tingling in her left arm, and back pain that developed after the cervical myelogram. Dr. Zoller noted that he and Dr. Anderson agreed that there was not a lot that could be done for her neck. (Tr. 181). Dr. Zoller went on to opine that "she is disabled from the standpoint of her neck and that she can't return to her former job." (Tr. 178).

On October 23, 2003, Mrs. Twigg advised Dr. Zoller that her pain level had not improved. Dr. Zoller referred her to Winchester Pain Management Center, where she underwent an initial examination by Stephen B. Pociask, M.D. on October 31, 2003. (Tr. 149, 152). Although Mrs. Twigg complained of constant pain in the cervical region, between her shoulder blades, and in the upper thoracic region of her back, her physical examination was relatively unremarkable. (Tr. 149). Mrs. Twigg had "some pain" to palpation in the cervical and upper paraspinous musculature and the left trapezius musculature; "some increased pain" with flexion of the cervical spine; and "mild increased pain" with lateral rotation of the cervical spine. (Tr. 150). She had full muscle strength in the bilateral upper extremities; intact sensation; and intact deep tendon reflexes. Dr. Pociask switched Mrs. Twigg to OxyContin and administered a cervical epidural steroid injection. (Tr. 150).

On a daily activities questionnaire dated November 15, 2003, Mrs. Twigg reported that she wakes up between 6:30 and 7:00 a.m. and goes to bed at approximately 10:00 p.m.; that she spends most of the day watching television and reading magazines; that she cares for her cats; that she is capable of driving; that she cooks dinner four to five nights per week; that she visits her mother and granddaughter each week; that she goes on short shopping trips with her sister

and niece; and that she performs basic cleaning chores, such as dusting, laundry, and sweeping. (Tr. 111-118).

Mrs. Twigg returned to Dr. Pociask on January 5, 2004. She reported that OxyContin and Percoset made her feel sedated and did not provide appropriate pain relief. Dr. Pociask switched plaintiff from OxyContin to Methadone and continued her on Percoset for breakthrough pain. The results of her physical examination were unchanged from October 31, 2003. (Tr. 148-150).

On January 15, 2004, Mrs. Twigg was examined by Tushar Patel, M.D. at Commonwealth Orthopaedics and Rehabilitation. Dr. Patel ordered additional testing. (Tr. 232). Eight days later, Mrs. Twigg returned to Winchester Pain Management Center, where she was examined by George K. VanOsten, M.D. Dr. VanOsten adjusted her medications and noted plaintiff's belief that Methodone had been beneficial. (Tr. 147).

A CT scan of the cervical spine was performed on February 9, 2004, at the request of Dr. Patel. The scan showed a bony fusion at C5-6, with no disc herniation or spinal stenosis. (Tr. 231). Likewise, the results of an electromyography and nerve conduction study performed on February 17, 2004 were normal. The study showed no evidence of left cervical radiculopathy, lumbosacral radiculopathy, or focal neuropathy. (Tr. 230).

In a letter dated February 23, 2004, Dr. Patel informed Mrs. Twigg that her "electrical studies are negative," that she "certainly do[es] not need any additional surgery," and that he "would strongly urge" against it. (Tr. 228).

On March 4, 2004, Rajeschwar S. Kadian, M.D., a state agency physician, reviewed plaintiff's medical records and completed a residual physical functional capacity assessment. (Tr. 233-240). Based on his review of the medical records, Dr. Kadian opined that Mrs. Twigg

9

can perform light work. (Tr. 234). Dr. Kadian indicated that Mrs. Twigg's allegations are credible, but that the objective data does not support a finding of total disability. Dr. Kadian further emphasized that her neurological examinations have been normal. (Tr. 235). On July 16, 2004, a second state agency physician, Luc Vinh, M.D., reviewed the record and affirmed Dr. Kadian's assessment. (Tr. 240).

On a questionnaire dated July 23, 2004, Mrs. Twigg reported that she drives; that she prepares meals; that she performs light housework, such as loading the dishwasher, dusting, and doing the laundry; that she works in her flower bed for a few minutes at a time; that she reads and watches television; that she feeds and waters her cats; that she shops; and that she visits family members. (Tr. 129-139).

On November 5, 2004, Mrs. Twigg returned to Winchester Pain Management Center for prescription counseling. She reported a pain level of seven out of ten. Mrs. Twigg was provided Methadone, as prescribed by Dr. VanOsten, and Kepra. (Tr. 257-258). She returned for prescription counseling on December 2, 2004. On physical examination, Mrs. Twigg complained of moderate pain to palpation of the cervical spine, and displayed full grip strength. (Tr. 256).

During prescription counseling on December 30, 2004, Mrs. Twigg reported that her pain level was six out of ten. She did not report any side effects from her medications and said that she was not having any problems with sedation. (Tr. 254). Similarly, on January 27, 2005, Mrs. Twigg reported that her pain level was five out of ten, and that she was experiencing mild sedation. Dr. VanOsten noted that Mrs. Twigg "seems to be doing quite well on the Methadone, Cymbalta and Provigil." (Tr. 252). On March 3, 2005, Mrs. Twigg complained of an increased pain level of seven out of ten. She reported that she had gone to a horse show and walked

10

around for approximately two hours, at which point her pain escalated. Mrs. Twigg explained that she can keep her pain in the four to five out of ten range if she has very little physical activity, but that her pain increases if she does more than light housework. Mrs. Twigg reported no side effects from her medication. (Tr. 250). On April 4, 2005, Mrs. Twigg reported a pain level of seven out of ten, and mild to moderate sedation with her medications. Nonetheless, Mrs. Twigg indicated that she walks when the weather permits, that she continues to perform normal household duties, and that she grooms her horse. (Tr. 249). Although Mrs. Twigg reported a pain level of seven out of ten on May 2, 2005, she also indicated that she tries to stay as active as possible, and that she continues to go shopping, do minor housework, and exercise twice per week. Plaintiff also reported experiencing no adverse effects from her medications. (Tr. 246).

On May 19, 2005, Dr. VanOsten administered four cervical trigger point injections. The physical examination prior to the injections revealed good grip strength in plaintiff's upper extremities; reasonable range of motion in her upper extremities; diffuse paravertebral cervical muscle spasm; and muscle pain in the upper shoulder girdle. (Tr. 245).

On June 2, 2005, Dr. VanOsten reported that Mrs. Twigg continued to complain of pain and sedation, but that her medication "allows her to have some level of activity." (Tr. 243). Dr. VanOsten prescribed Avinza and Percoset in place of Methadone. (Tr. 243).

Mrs. Twigg was examined by Nino Dobrovic, M.D. at Winchester Pain Management Center on June 29, 2005. Dr. Dobrovic noted that Mrs. Twigg reported a definite improvement in both her pain control and level of sedation as a result of the change in medications. (Tr. 241). Although she continued to report a significant level of pain, Dr. Dobrovic noted that the new routine allows her to function at a higher level. (Tr. 241).

11

During the administrative hearing on August 3, 2005, Mrs. Twigg testified that she drives without any restrictions on her driver's license, but that she has problems with drowsiness and turning her head to check for traffic. (Tr. 34). Mrs. Twigg testified that she and her husband do the cooking, and that she and her daughter-in-law do the cleaning. (Tr. 34). When asked to describe her typical day, Mrs. Twigg testified that she wakes up at 9:00 a.m.; that she watches the news until her pain medication begins to take effect; and that she watches television or walks outside after eating breakfast. (Tr. 34). With respect to the distance that she walks, Mrs. Twigg testified that she walks approximately 600 yards to the mailbox and back to her house. (Tr. 34). Mrs. Twigg also testified that she fixes herself a quick lunch, that she talks to her mother, and that she listens to the radio. (Tr. 35). Mrs. Twigg testified that she has not looked for any work because of constant pain, and that her medications have no positive impact. (Tr. 33, 35). Mrs. Twigg also testified that, in the past, her pain worsened after she underwent physical therapy and epidural steroid injections. (R. 37, 38). Additionally, Mrs. Twigg testified that she naps during the day as a result of drowsiness, and that her pain worsens with sitting, standing, lying down, and walking. (Tr. 40).

The Law Judge then sought the testimony of James Michael Ryan, a vocational expert. The Law Judge asked the vocational expert whether jobs exist for an individual with the same age, education, and work experience as plaintiff, "who has the capacity to do sedentary work, unskilled, with a sit/stand option and limited general public contact." (Tr. 42). In response, Mr. Ryan testified that it would be possible for such individual to work as a quality control worker, finish machine operator, or unarmed security worker. (Tr. 42-43). The Law Judge then asked the vocational expert whether jobs exist for an individual with the same age, education, and work experience as plaintiff, "who has the capacity to do light work, unskilled with a sit/stand opinion,

12

limited general public contact." (Tr. 43). In response, Mr. Ryan testified that such individual could work as a general clerical worker, laundry worker, or table worker. (Tr. 43). Mr. Ryan further testified that these sedentary and light positions exist in significant number in both the national and regional economies. (Tr. 42-44).

In summary, the medical record and lay testimony indicate that Mrs. Twigg suffered a cervical injury in October of 2001, for which she underwent two surgeries. While she has complained of severe and disabling pain since the accident, the x-ray studies, MRI studies, and clinical findings since her surgeries are relatively unremarkable. In assessing the plaintiff's residual functional capacity, the Law Judge credited the plaintiff's complaints of pain. However, the medical evidence, including the objective findings, corroborates the Law Judge's conclusion that the plaintiff's impairments are not totally disabling, and that she retains the residual functional capacity to perform a reduced range of light and sedentary work. The Law Judge's residual functional capacity assessment is also supported by the findings of the state agency physicians. In March 2004 and July 2004, respectively, Dr. Kadian and Dr. Vinh reviewed the record, including the plaintiff's allegations of chronic pain and medication side effects, and determined that the plaintiff retains the capacity to perform a full range of light work. The Law Judge's residual functional capacity assessment is consistent with, but even more restrictive than, these physicians' findings.

Additionally, the plaintiff's own statements regarding her activities and abilities support the Law Judge's determination. During the relevant period, Mrs. Twigg acknowledged that she drives; that she prepares dinner four or five times per week; that she cares for her cats; that she does light housework, including dusting, vacuuming, and laundry; that she shops and visits family members; that she reads and watches television everyday; that she walks 600 yards to and

13

from her mailbox; and that she works in her flower bed. Likewise, during medical appointments, Mrs. Twigg indicated that she exercises; that she grooms her horses; and that she continues to perform normal household duties. Simply stated, plaintiff's self-reported activities support the determination that, despite her impairments, she is not totally disabled.

On appeal to this court, Mrs. Twigg makes several arguments as to why she believes the administrative consideration of her case was deficient. First, Mrs. Twigg argues that the Law Judge failed to properly consider her complaints of pain and numbness. However, the court believes that the Law Judge adequately addressed the plaintiff's subjective complaints. It is well settled that, in order to establish a disability on the basis of pain, a claimant must demonstrate the existence of a medical impairment that reasonably could be expected to produce the pain alleged. See Craig v. Chater, 76 F.3d 585, 594 (4th Cir. 1996); see also 20 C.F.R. § 404.1529(b). Although it is not necessary that the claimant's medical evidence prove the severity of the pain alleged, Mickles v. Shalala, 29 F.3d 918, 919 (4th Cir. 1994), it is necessary that the claimant demonstrate that she suffers from some problem which is capable of causing the subjective symptomatology of which the claimant complains. Hyatt v. Sullivan, 899 F.2d 329, 337 (4th Cir. 1990). In this case, the Law Judge considered Mrs. Twigg's subjective complaints, and, after determining that she has impairments capable of causing the type of symptoms alleged, considered the extent to which the claimed symptoms affect her ability to work. (Tr. 19-24). The Law Judge found that the plaintiff's subjective complaints are generally credible, but that they do not preclude all gainful employment. (Tr. 23). Specifically, the Law Judge found that the plaintiff's allegations of totally disabling pain and numbness are inconsistent with the weight of the objective medical findings, the plaintiff's reported daily activities, and the opinions of the state agency physicians. Having reviewed the record, the court concludes that the Law Judge

14

properly evaluated the plaintiff's subjective complaints, and that the plaintiff's argument in this regard is without merit.

Mrs. Twigg next argues that the Law Judge failed to give appropriate weight to the opinion of Dr. John Zoller, her treating orthopaedic surgeon. To support this argument, Mrs. Twigg emphasizes that on August 8, 2003, Dr. Zoller noted that he "do[es] feel she is disabled from the standpoint of her neck and that she can't return to her former job." (Tr. 178). While Mrs. Twigg suggests that Dr. Zoller's examination note expresses an opinion that she is totally disabled, the court disagrees. Rather than indicating that she is disabled for all forms of substantial gainful employment, Dr. Zoller specifically opined that Mrs. Twigg cannot return to her previous job. The Law Judge ultimately agreed with Dr. Zoller, concluding that Mrs. Twigg is disabled for all past relevant work roles. Thus, the court concludes that the Law Judge's assessment of Dr. Zoller's opinion was appropriate.[2]

Mrs. Twigg also contends that the Law Judge failed to properly consider the side effects of her medications, such as drowsiness and sedation. However, plaintiff's claim of disabling side effects is inconsistent with the findings of the state agency physicians, who specifically considered the side effects of Mrs. Twigg's medications. (Tr. 233-240). The plaintiff's claim is also inconsistent with her reported daily activities, and her own statements, on several occasions during 2004 and 2005, that her medications caused no adverse side effects or no more than mild or mild to moderate sedation. (Tr. 241, 246, 249-250, 252, 254). See Burns v. Barnhart, 312 F.3d 113, 131 (3rd Cir. 2002) ("Drowsiness often accompanies the taking of medication, and it should not be viewed as disabling unless the record references serious functional limitations."). Additionally, as the Commissioner points out, the Law Judge accommodated any side effects the

---

[2] The court notes that while the Law Judge did not specifically mention the opinion expressed in Dr. Zoller's August 8, 2003 examination note, the Law Judge noted that "no treating sources opined that the claimant was totally disabled to do all types of work." (Tr. 24).

15

plaintiff may experience by limiting her to unskilled sedentary and light work with a sit/stand option that does not require more than limited contact with the general public.

Along similar lines, Mrs. Twigg's subjective allegations that she has extreme difficulty turning her head and decreased use of her left arm are inconsistent with her self-reported daily activities, which include exercising, working in the flower bed, driving, reading, and housecleaning, and the findings of the state agency physicians, who did not include such limitations in their residual functional capacity assessments. Likewise, Mrs. Twigg's subjective complaints regarding her neck and her left upper extremity are inconsistent with the objective medical findings. For instance, Mrs. Twigg's physical examinations regularly showed normal sensation, normal muscle strength, and normal grip strength. (Tr. 148, 150, 174, 180, 192, 196, 230, 245, 248, 256). In April of 2005, Mrs. Twigg merely had "some" decreased range of motion in the cervical spine (Tr. 248), and in May of 2005, Dr. VanOsten reported that Mrs. Twigg possessed reasonable range of motion in the upper extremities. (Tr. 245). The aforementioned evidence supports the Law Judge's assessment of the plaintiff's subjective complaints.[3]

Mrs. Twigg next contends that the hypothetical question posed to the vocational expert was incomplete, in that it did not include the alleged limitations associated with her drowsiness, her difficulties moving her head up and down, and her inability to speak much above a whisper. The United States Court of Appeals for the Fourth Circuit has held that the opinion of a vocational expert is not relevant or helpful if it is not expressed "in response to proper

---

[3] In her brief in support of her motion for summary judgment, Mrs. Twigg contends that she has problems talking and that she is unable to speak "much above a whisper" due to her surgeries. (Pl.'s Brief at 21, 28). However, this contention is at odds with her failure to allege that her disability was due, even in part, to communicative limitations when she applied for benefits in 2003 (Tr. 73), as well as her failure to regularly complain about such speaking difficulties to her physicians. Moreover, in describing her daily activities, Mrs. Twigg indicated that she regularly visits relatives, and that she talks on the phone everyday. (Tr. 115, 135).

16

hypothetical questions which fairly set out [a] claimant's impairments." Walker v. Bowen, 889 F.2d 47, 50 (4th Cir. 1989). As the Court recently explained in Fisher v. Barnhart, 181 Fed. Appx. 359, 364 (4th Cir. 2006), "a hypothetical question is unimpeachable if it 'adequately reflect[s]' a residual functional capacity for which the ALJ had sufficient evidence." (quoting Johnson v. Barnhart, 434 F.3d 650, 659 (4th Cir. 2005)). Here, as previously stated, the Law Judge asked the vocational expert whether jobs exist for an individual with the same age, education, and work experience as plaintiff, "who has the capacity to do sedentary work, unskilled, with a sit/stand option and limited general public contact." (Tr. 42). The Law Judge also asked the vocational expert whether jobs exist for an individual with the same age, education, and work experience as plaintiff, "who has the capacity to do light work, unskilled with a sit/stand opinion, [and] limited general public contact." (Tr. 43). Having concluded that the Law Judge's residual functional capacity determination is supported by substantial evidence, that the plaintiff's drowsiness is not disabling, and that any other additional limitations alleged by the plaintiff are not supported by the record, the court concludes that the hypothetical questions posed to the vocational expert adequately reflected Mrs. Twigg's impairments.

Finally, Mrs. Twigg maintains that, in adopting the Law Judge's opinion as the final decision of the Commissioner, the Appeals Council failed to give adequate reasons for not requiring further consideration of the case in light of the additional evidence that the plaintiff submitted in connection with her request for review. It is true that this court has held that it is sometimes necessary to remand a case to the Commissioner for further consideration when the Appeals Council fails to give reasons for concluding that such "interim" evidence is not such as to justify a change in the Law Judge's decision. See Alexander v. Apfel, 14 F. Supp. 2d 839 (W.D. Va. 1998). However, in Alexander, the court noted that remand is unnecessary when it is

17

clear upon review of the "interim evidence" that the Commissioner's underlying decision is, or is not, supported by substantial evidence. Id. at 844, n.3.

In the instant case, the court does not believe that the evidence submitted by Mrs. Twigg to the Appeals Council is such as to require additional consideration by the Law Judge. The new medical records include additional treatment notes from Dr. Zoller and the Winchester Pain Management Center, as well as a form completed for Mrs. Twigg's credit card company. The additional treatment records indicate that on October 26, 2004, Dr. Zoller noted, on the basis of MRI testing, that Mrs. Twigg has a solid fusion, and that he would not anticipate further surgery. (Tr. 266). Mrs. Twigg was examined by Dr. Dobrovic at the Winchester Pain Management Center on July 28, 2005. Although she complained of continued sedation, Dr. Dobrovic noted that "this is primarily due to lack of sleep at night," as opposed to her medications. (Tr. 275). Mrs. Twigg was examined by Alok Gopal, M.D. at Winchester Pain Management Center on September 26, 2005. While she continued to complain of pain and difficulty sleeping, Dr. Gopal noted that she can still "clean the house, cook meals, drive a car and live independently." (Tr. 271). Likewise, on October 24, 2005, Dr. Gopal noted that Mrs. Twigg "can clean the house, cook meals, drive a car and [take] short walks and shopping trips." (Tr. 269). Dr. Gopal also indicated that Mrs. Twigg reported no adverse side effects with her medications. (Tr. 269). Having reviewed the aforementioned treatment records, the court finds no cause for remand of this case to the Commissioner for further consideration.

Likewise, the credit card form completed by Dr. Zoller does not provide a basis to alter the Law Judge's decision. On the form, dated April 6, 2005, Dr. Zoller marked that Mrs. Twigg is "unable to perform the duties of any occupation, due to sickness or accidental injury." (Tr. 265). However, prior to completing the form, Dr. Zoller had not treated Mrs. Twigg for over

five months, and there is no medical evidence demonstrating any exacerbation in the plaintiff's symptoms. Accordingly, the court finds no basis for remanding the case to the Commissioner for further consideration of this form.

In summary, the court has concluded that the legal arguments advanced by plaintiff in opposition to the defendant's motion for summary judgment are without merit. Additionally, the court concludes that the final decision of the Commissioner must be affirmed. In affirming the Commissioner's final decision, the court does not suggest that Mrs. Twigg is totally free of pain and discomfort. Indeed, the regularity with which plaintiff has sought medical treatment is an indication that she does experience some substantial measure of pain and discomfort. On the other hand, it must again be noted that no doctor, since her second surgery, has identified any specific physical problems that could be expected to produce totally disabling pain and limitations. It must be recognized that the inability to work without any subjective complaints does not of itself render a claimant totally disabled. Craig, 76 F.3d at 592. Once again, it appears to the court that the Administrative Law Judge considered the subjective factors reasonably supported by the medical record in adjudicating plaintiff's claims for benefits. It follows that all facets of the Commissioner's final decision are supported by substantial evidence.

As a general rule, the resolution of conflicts in the evidence is a matter within the province of the Commissioner, even if the court might resolve the conflicts differently. Richardson v. Perales, supra; Oppenheim v. Finch, 495 F.2d 396 (4th Cir. 1974). For the reasons stated, the court finds the Commissioner's resolution of the pertinent conflicts in the record in this case to be supported by substantial evidence. Accordingly, the final decision of the Commissioner must be affirmed. Laws v. Celebrezze, supra.

19

The Clerk is directed to send certified copies of this memorandum opinion and the accompanying order to all counsel of record.

ENTER: This __30th__ day of November, 2007.

/s/ Jack Conrad
United States District Judge